## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| South Branch LLC, TFO Golub Burnham LLC**,** d/b/a The Burnham Center, TFO Golub IT 2.0 LLC, d/b/a International Tower, and Rockwell on the River LLC, for themselves individually and for all class members similarly situated | ) ) ) ) ) ) | |
| | ) | **CLASS ACTION** |
| Plaintiffs, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| Commonwealth Edison Company d/b/a ComEd; and Exelon Corporation, | ) ) ) | |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiffs, as the owners of four large commercial buildings and ComEd customers, individually and on behalf of all others similarly situated, by their attorneys, Hughes, Socol, Piers, Resnick & Dym, Ltd., bring this action against Defendant Commonwealth Edison Company, doing business as ComEd ("ComEd") and its parent company Defendant Exelon Corporation ("Exelon") (collectively "Defendants"). In support, Plaintiffs state as follows:

### INTRODUCTION

1.     Defendants ComEd and its parent company, Exelon, have admitted to an extraordinary nine-year scheme which involved the payment of repeated bribes to and for the benefit of the Speaker of the Illinois General Assembly, Michael Madigan ("Speaker Madigan"), his associates, and other Illinois legislators in exchange for the passage of legislation that earmarked well over two billion dollars in subsidies for Exelon and allowed, and continues to allow,  ComEd and Exelon to take billions of dollars from Illinois utility customers to unlawfully inflate their profits.

2.      The legislation secured by Defendants' illegal bribery scheme locked in automatic and ongoing utility distribution rate and other fee increases for customers of ComEd.

3.      The legislation was designed to and did raise profits for the utilities and it soaked ComEd's largest customers with the bulk of the cost.

4.      The cost increases associated with the illegally conceived legislation fell disproportionately on ratepayers in ComEd's largest rate classes. Those ratepayers bore the largest and highest percentage rate increases and a disproportionate burden from new utility revenues enabled by the illegally purchased legislation.

5.      Defendants have confessed to numerous unlawful acts of corruption, fraud, and bribery through a sprawling criminal enterprise involving energy executives, lobbyists, law firms, and consultants that spans at least nine years and continued to operate until exposed by the criminal prosecution of the United States Attorney for the Northern District of Illinois. While the bribery and illegal manipulation of the legislature may have ceased, the harms inflicted on ComEd's ratepayers continue.

6.      Defendants' long-running pattern of illegal consideration was widespread and varied. Defendants placed political operatives on payroll as "ghost payrollers," concealed through cooperating pass-through organizations, . Defendants hired at least one law firm identified and directed by Madigan and other legislators to do little or no real legal work but rather to curry political favor. Defendants gave away a seat on the board of directors of ComEd, a major utility company, at the behest of Madigan. Defendants provided jobs to public officials to hand out as political favors to their operatives and cronies. Defendants bribed Speaker Madigan and others to pass legislation that generated billions of additional dollars in revenue and profits for large electric utilities in Illinois. Defendants' lawless conduct was extreme.

7.      Defendants already admitted, accepted, and acknowledged in a Deferred Prosecution Agreement,[1] entered on July 17, 2020, that they are responsible under federal criminal law for these and other acts of their current and former officers, employees, and agents as charged in the Agreement's Statement of Facts, which describes a vast conspiracy to bribe its way to hugely inflated profits off the backs of Illinois ratepayers. Defendants agreed and accepted responsibility for bribery in violation of 18 U.S.C. § 666(a)(2) and will pay $200 million in fines to the United States Treasury.

8.      The Deferred Prosecution Agreement describes a coordinated enterprise of entities and individuals, headed by ComEd and Exelon, whose top officials agreed to and executed a long-running pattern of criminal conduct, including bribery and corruption of public officials, in violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 961, *et seq*., specifically 18 U.S.C. § 1962 (c) and (d).

9.      The purpose and result of this sprawling corrupt enterprise was to secure favorable legislation that filled Defendants' coffers.

10.      The enterprise was wildly successful in achieving its purpose. From 2011 through the present day, Defendants bought their way to remarkably favorable treatment by the Illinois legislature. In particular, Defendants secured through criminal and fraudulent means the passage and favorable provisions of the 2011 Energy Infrastructure and Modernization Act ("EIMA"), 2013 amendments to the EIMA, and the 2016 Future Energy Jobs Act ("FEJA") (collectively, the "Legislation"). The Legislation, among other things, (a) locked in by statutory mandate higher and automatic ongoing distribution utility rate increases to inflate Defendants' profits; (b)

---

[1] The Deferred Prosecution Agreement and accompanying documents, including the Statement of Facts, are hereby incorporated into Plaintiffs' Class Action Complaint and are attached as **Exhibit 1**

mandated a range of new charges and fees as additional revenue streams and profit centers for ComEd; and (c) provided a $2.35 billion earmark for Exelon.

11.     This bribery was - and continues to be - extraordinarily profitable for the Defendants. ComEd and Exelon admit to paying $1.3 million in bribes related to and for the benefit of Speaker Madigan since 2011. In return, ComEd annual profits jumped more than 50%—from $480 million in 2012 to $739 million in 2019, while Exelon alone gained an extra $2.35 billion in directly earmarked subsidy, among other benefits. Though Defendants admit their unlawful gains total at least $150 million, their true ill-gotten profits as a result of the Legislation are multiples higher. ComEd alone has pocketed $860 million in higher profits over the last several years. Utility customers, none the wiser to this fraudulent and illegal conduct, were stuck with bills that run into the billions with the majority of increased distribution charges falling on the small set of large commercial ratepayers.

12.     Large ratepayers suffered a disproportionate injury as a result of Defendants' bribery scheme. In order to avoid the political backlash that would result from making millions of residential ratepayers (and voters) pay more, ComEd crafted the changes to require that most of the increases had to be paid by large commercial ratepayers. From 2011 to 2019, the roughly 22,000 large commercial ratepayers of ComEd paid distribution rates that increased on average approximately 25.5% (depending on their rate classification), with some paying bills as much as 78% higher on average. In contrast, the roughly 270,000 small commercial ratepayers saw a 5.7% jump on average, and 3.6 million ComEd residential ratepayers an average 7.7% increase. The average residential ratepayer pays $29 a year more to ComEd, the small commercial ratepayer $66 more, and the *average* large commercial ratepayer $6,445 more.

13.     In 2019 alone, ComEd reaped an estimated $250 million more in gross revenue from distribution charges[2] than it did prior to when the EIMA took effect. Approximately $134 million—54% of that revenue gain, came from 0.5% of its customers, those in the large commercial ratepayer categories. From 2012-2019, ComEd gained approximately $860 million in net profits. An estimated $450 million—or 54% of those profits, came from customers in the large commercial ratepayer categories.

14.     These massive disparities in who pays for ComEd and Exelon's corruption stem not from the volume of electricity a building uses, where larger buildings typically pay more, but rather primarily from the rate setting formulas for distribution rates which ComEd and Exelon purchased from the legislative process through wanton corruption.

15.     Plaintiffs are large commercial ratepayers who, on behalf of themselves and a class of all similarly situated large ComEd commercial utility customers, seek compensation for their damages from Defendants' illegal scheme of bribery, fraud, and corruption through claims for violation of the federal RICO Act including RICO conspiracy, as well as under the Illinois Consumer Fraud and Deceptive Practices Act, and for common law civil conspiracy and unjust enrichment.

---

[2] An electric utility bill contains three basic categories of charges. First there are "distribution charges" or "delivery service charges" purportedly for the cost of providing the electric grid infrastructure. This is the primary source of revenue and profit for ComEd. Second, there are supply charges paid for each unit of electricity consumed on a per kWh basis.  The electric supply charge is paid to ComEd by default (roughly at the cost), or to an alternative energy supplier selected by the customer. Third, there are taxes and fees paid to government entities and ComEd for various purposes and programs.

**JURISDICTION AND VENUE**

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 961, *et seq*., specifically 18

U.S.C. § 1964 (c).

17.    This Court also has jurisdiction over this action as a class action pursuant to the

Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), providing for jurisdiction where, as

here, "any member of a class of plaintiffs is a citizen of a State different from any defendant,"

and the aggregate amount in controversy exceeds five million dollars, exclusive of interests and

costs.

18.    Venue is proper in this judicial district under 18 U.S.C. § 1965(a) and 28 U.S.C. §

1391(a), (b), and (c) because a substantial part of the events and omissions giving rise to this

action occurred in the Northern District of Illinois, both Defendants have their headquarters in

Chicago, and because Defendants transacted business in this district.

**PARTIES**

A.    **Plaintiffs**

19.    Plaintiff South Branch LLC ("South Branch") owns a large commercial building

in Chicago, Illinois at 1200 West 35th Street. South Branch is an electric utility customer of

ComEd in the "Large" non-residential load distribution rate class. As a result of Defendants'

conduct alleged herein, Plaintiff South Branch has been damaged through higher utility costs and

diminished property values.

20.    Plaintiff TFO Golub Burnham LLC**,** d/b/a The Burnham Center, ("Burnham

Center") owns a large commercial building in Chicago, Illinois at 111 West Washington Street.

The Burnham Center is an electric utility customer of ComEd in the "Very Large" non-

6

residential load distribution rate class. As a result of Defendants' conduct alleged herein, Plaintiff Burnham Center has been damaged through higher utility costs and diminished property values.

21.     Plaintiff TFO Golub IT 2.0 LLC, d/b/a International Tower, ("International Tower") owns a large commercial building in Chicago, Illinois at 8550 West Bryn Mawr Avenue. International Tower is an electric utility customer of ComEd in the "Large" non-residential load distribution rate class. As a result of Defendants' conduct alleged herein, Plaintiff International Tower has been damaged through higher utility costs and diminished property values.

22.     Plaintiff Rockwell on the River LLC ("Rockwell on the River") owns a large commercial building in Chicago, Illinois at 3057 North Rockwell Street. Rockwell on the River is an electric utility customer of ComEd in the Medium non-residential load distribution rate class. As a result of Defendants' conduct alleged herein, Rockwell on the River has been damaged through higher utility costs and diminished property values.

**B.      Defendants**

23.     Commonwealth Edison Company, d/b/a ComEd, is an Illinois corporation with its headquarters located in Chicago, Illinois.

24.     ComEd is the largest utility company in the State of Illinois, employing over 6,000 individuals. ComEd's customers include, but are not limited to, Illinois citizens, citizens of other states that own property in Illinois, and citizens of other states that own businesses that operate in Illinois.

25.     ComEd's service territory comprises the majority of northern Illinois, including the Chicago metropolitan area and extending to the Wisconsin border to the north, the Iowa

border to the west, the Indiana border to the east, and the Iroquois County border to the south.

26.      ComEd provides electricity to approximately 4 million customers in Northern Illinois—roughly 70 percent of the state's electric utility ratepayers.  This total includes approximately 3.6 million residential customers and 270,000 small commercial customers.

27.      ComEd also provides electricity to approximately 22,000 "Large Commercial Ratepayers" in its "Medium", "Large", "Very Large", and "Extra Large" load delivery categories.

28.      ComEd is effectively a wholly-owned subsidiary of Exelon Corporation. ComEd holds itself out as an Exelon Company on its websites and in its corporate logo.

29.      Exelon Corporation is a Pennsylvania corporation with its headquarters located in Chicago, Illinois. Exelon is the parent company of Defendant ComEd. Exelon Generation, a wholly owned subsidiary of Exelon, owns nuclear power plants in Illinois, including the plants in Clinton, Illinois and Cordova, Illinois.

30.      At all relevant times, Exelon exercised control over and managed the day to day operations of ComEd.

**FACTUAL BACKGROUND**

A.      **Defendants bribed Illinois public officials to obtain long-sought legislation that benefitted ComEd and Exelon and injured Plaintiffs' business and property interests.**

31.      As a utility company operating in and organized under the laws of the State of Illinois, ComEd is subject to extensive regulation by the Illinois General Assembly and State of Illinois.

32.      The ability of ComEd and Exelon to make money and the amount of profits they can generate in Illinois depend largely on the rates they can charge and how those rates are set by

the Illinois Public Utility Act. As Jay Doherty, one member of this corrupt racketeering enterprise put it, ComEd's money "comes from Springfield."

33.     In 2003 the General Assembly rejected a rate hike that John Rowe, then CEO of Exelon, had claimed was critically needed for ComEd to complete the acquisition of troubled downstate utility company Illinois Power. When Speaker Madigan withheld his support for ComEd's efforts, that legislation failed and ComEd and Exelon walked away empty handed. As a result, ComEd and Exelon began a campaign to buy favor with Speaker Madigan and other key members of the Illinois General Assembly. Defendants need favorable treatment from Springfield for their business interests, and they pursued it at any cost. Defendants developed an elaborate illegal enterprise and resorted to bribery to change their fortunes.

34.     As part of those efforts, from in or around 2011 through at least in or around 2019, Defendants created and managed an enterprise of executives, lobbyists, law firms, contractors, and others to bribe and influence Illinois elected officials and secure favorable legislation for utilities, as set forth in the Deferred Prosecution Agreement, attached hereto as **Exhibit 1**.

35.     To get rate hikes and other favorable legislation through the Illinois General Assembly, ComEd and Exelon instituted a racketeering campaign of bribery of Speaker Madigan and other key legislators.

36.     Throughout the relevant time period, Exelon was aware of, directly participated in, and oversaw the unlawful pay-to-play scheme described herein.

37.     By 2010, ComEd and Exelon had deployed an army of lobbyists to work on Speaker Madigan and other members of the General Assembly, to the point where the ratio of lobbyists to legislators was nearly 1:1, and for each key legislator, Defendants employed a

designated lobbyist with whom the legislator had a personal relationship.

38.     In its push to illegally influence public officials and secure passage of the 2011 EIMA, the 2013 EIMA amendments, and the 2016 FEJA, ComEd arranged for various close associates and key political allies of Speaker Madigan and other Illinois elected officials to obtain jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts from ComEd.

39.     Such jobs, payments, and other benefits often involved "ghost payroll" situations where those employed actually did little or none of the work that they were purportedly hired to perform.

40.     These jobs, payments, and other benefits to political allies of Speaker Madigan were given as an inducement for Speaker Madigan to get legislation passed which was favorable to ComEd and Exelon like the 2011 EIMA, the 2013 EIMA amendments, and the 2016 FEJA.

41.     ComEd and Exelon admit and agree that they were not engaged in lawful lobbying or protected speech.  Rather, ComEd and Exelon admit to criminal conduct— a sustained campaign of illegal bribery of elected officials.

42.     Defendants' enterprise and ongoing practice of corruption centered on Speaker Madigan as an extremely powerful public official with the ability to control legislation.

43.     Speaker Madigan's control over legislative matters was not only as a result of his political and financial power over Democratic members of the Illinois Legislature (and others) as Chairman of the Illinois Democratic Party, but also because as Speaker of the House, he exercises complete control over what measures are called for a vote in the House of Representatives.

44.    As Defendants admit, this enterprise focused on inducing Speaker Madigan moving legislation for ComEd:

> [Michael J. Madigan][3] was the Speaker of the House of Representatives and an elected member of that body. As Speaker of the House of Representatives, [Madigan] was able to exercise control over what measures were called for a vote in the House of Representatives. [Madigan] also exercised substantial influence and control over fellow lawmakers concerning legislation, including legislation affecting ComEd. Beginning no later than in or around 2011, and continuing through in or around 2019, in the Northern District of Illinois, Eastern Division, and elsewhere, [ComEd], defendant herein, corruptly gave, offered, and agreed to give things of value, namely, jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts, for the benefit of [Madigan] and [Madigan]'s associates, with intent to influence and reward [Madigan], as an agent of the State of Illinois, a State government that during each of the twelve-month calendar years from 2011 to 2019, received federal benefits in excess of $10,000, in connection with any business, transaction, and series of transactions of $5,000 or more of the State of Illinois, namely, legislation affecting ComEd and its business [i]n violation of Title 18, United States Code, Section 666(a)(2).

45.    This corrupt enterprise was continuous and long running.

46.    Defendants admit they bribed Illinois public officials "each of the twelve-month calendar years from 2011 to 2019."

47.    For instance, ComEd hired Angie Sandoval, Senator Martin Sandoval's daughter, in exchange for support for the passage of the 2011 EIMA.[4]

**Defendants Pay Speaker Madigan's Associates Through Jay Doherty & Associates[5]**

48.    For decades, Michael McClain ("McClain") has been a prominent lobbyist in

---

[3] Speaker Madigan is "Public official A" in the Deferred Prosecution Agreement.

[4] Martin Sandoval was a member of the Senate Committee on Energy and Public Utilities. He resigned from the Illinois Senate on January 1, 2020, and on January 28, 2020, he agreed to plead guilty to federal charges of bribery and filing a false tax return. As part of his plea agreement, Sandoval agreed to cooperate with ongoing federal investigations, including, on information and belief, the investigation of ComEd and Exelon.

[5] Jay Doherty & Associates is referred to as "Company 1" in the Deferred Prosecution Agreement.

Springfield with a close personal and professional relationship with Speaker Madigan.

49.     ComEd retained McClain as an external lobbyist and consultant. McClain was in charge of the ComEd legislative and lobbying efforts regarding the General Assembly, and regularly met with and coordinated strategy with other lobbyists for Exelon. McClain, ComEd, and Exelon lobbyists were understood among members and staff of the General Assembly to be the team tasked by Defendants with securing the legislative wishes of ComEd and Exelon.

50.     Beginning in or around 2011, ComEd provided through McClain and to Speaker Madigan ComEd jobs, vendor subcontracts, and monetary payments for various associates of Speaker Madigan such as precinct captains who worked for Speaker Madigan in his legislative district and other political allies.

51.     Beginning in or around 2011, John Hooker,[6] ComEd's Vice President of legislative and external affairs from 2009-2012, and an external lobbyist for ComEd from 2012-2019, together with McClain developed a plan with Jay Doherty,[7] a longtime political operative and the principal of the Jay D. Doherty & Associates ("JDA"), a lobbying firm employed by ComEd, and the president and a board member of the City Club of Chicago, to use JDA as a "pass through" for payments to Speaker Madigan's "Associates 1 and 2."[8] Defendants paid JDA, and JDA paid those "associates" as purported subcontractors in invoices and contracts.

52.     McClain, Doherty, and Hooker and others planned and facilitated this scheme

---

[6] Hooker is referred to as Lobbyist 1 in the Deferred Prosecution Agreement.

[7] Doherty is referred to as Consultant 1 in the Deferred Prosecution Agreement. In addition to owning and operating JDA, Doherty was for many years the president and a member of the board of City Club of Chicago, a prominent, politically connected policy forum. He resigned from both City Club positions in December 2019 in the face of allegations that he was a conduit for as many as 100 ComEd financed jobs. Doherty and JDA reportedly received $3.1 million in fees from ComEd.

[8] These Associates are referred to as Associates 1 and 2 in the Deferred Prosecution Agreement.

through conversations in person, over email, and over the phone among themselves and with various employees of Defendants.

53.     During the period 2011 to 2019, Doherty and JDA, with the direction of McClain for ComEd, executed written contracts and submitted invoices to ComEd. These invoices and documents made it falsely appear that payments made to JDA were all in return for Doherty's advice on "legislative issues" and "legislative risk management activities," and other similar matters. In fact, a large portion, if not all, of the compensation paid to JDA was intended for ultimate payments to Speaker Madigan's associates, who did little to no work for ComEd, or Doherty, or JDA.

54.     ComEd, through the JDA, continued to pay Associates 1 and 2, and other "subcontracted" associates of public officials, until 2019. The associates paid by ComEd and/or Exelon did little to no work for these payments during this period. The payments were simply bribes to influence legislation.

55.     ComEd concealed the identity of the associates by paying them indirectly through JDA. Thus, neither the associates nor Speaker Madigan or any public official were identified through ComEd's vendor payment system.

56.     Senior executives and agents of ComEd and Exelon were aware of and approved of these payments made to curry favor with Speaker Madigan and obtain legislation from the General Assembly from their inception until they were discontinued in or around 2019.

57.     For example, Anne Pramaggiore,[9] president and CEO of ComEd from 2012 until June 2018 and then senior executive vice president and CEO of Exelon Utilities[10] until her

_____

[9] Pramaggiore is referred to as "CEO-1" in the Deferred Prosecution Agreement

[10] Exelon Utilities is a wholly owned subsidiary of Exelon, which in turn is the parent of ComEd and five other utility companies owned by Exelon.

resignation in October 2019,[11] was aware of the arrangement wherein ComEd would pay associates of Speaker Madigan through JDA as "subcontractors." She referred to these associates as the "roster."

58.     The corrupt enterprise of ComEd, Exelon, and related lobbyists and entities used JDA as an established mechanism for ComEd to payoff associates of Speaker Madigan and buy legislative favor.

59.     For instance, in or around May 2018, Speaker Madigan, through McClain, asked Pramaggiore to hire Alderman Michael R. Zalewski ("Zalewski"),[12] a political ally of Speaker Madigan who was retiring from the Chicago City Council at the end of the month.

60.     Pramaggiore, Doherty, and Fidel Marquez, Jr.,[13] ComEd's Senior VP for legislative and external affairs from March 2012 to September 2019, agreed that ComEd would pay Zalewski approximately $5,000 a month indirectly as a subcontractor through JDA. Pramaggiore agreed that Speaker Madigan should inform Zalewski of the arrangement.

61.     In or around 2018, the ComEd contract with JDA was revised to include extra payments to Zalewski. Doherty concealed these corrupt payments by falsely explaining the increase by citing JDA's "expanded role with the Cook County Board president's office and Cook County Commissioners and Department Heads."  In fact, the additional $5,000 per month was intended for payment to Zalewski to buy favorable legislative treatment from Speaker Madigan.

---

[11] Pramaggiore abruptly resigned on October 15, 2019 from Exelon Utilities without explanation. On information and belief, her resignation was due to the escalating federal investigation into the corrupt activities that are alleged herein, and her involvement in those activities.

[12] Zalewski is referred to as "Associate 3" in the Deferred Prosecution Agreement.

[13] Marquez is referred to as "Senior Executive 1" in the Deferred Prosecution Agreement.

62.     ComEd knowingly approved the extra payments to Zalewski.

63.     Senior executives and agents of ComEd and Exelon were also aware of the purpose of these payments to Speaker Madigan's associates, namely that they were intended to influence and reward Speaker Madigan for advancing ComEd and Exelon's interests in connection with the exercise of his official duties such as by passing the EIMA, the EIMA amendments, and the FEJA.

64.     For example, on or about May 16, 2018, McClain explained to ComEd Senior VP Marquez that ComEd paid certain individuals indirectly through JDA to obtain favorable treatment from Speaker Madigan. Specifically, he said that ComEd paid "Associate 1" to do no work because he was "one of the top three precinct captains" for Speaker Madigan who also "trains people how to go door to door so just to give you an idea how important the guy is."

65.     On or about February 7, 2019, McClain advised ComEd Senior VP Marquez to "don't put anything in writing" about the JDA contract renewal because when documenting corruption, "all it can do is hurt ya." McClain specifically advised Marquez to explain—verbally not in writing—that ComEd was paying JDA to then pay Madigan associates, which included former ward committeemen and aldermen, as a "favor," and that it would be up to Doherty, not ComEd, to prove the associates did work in exchange for the payments.

66.     On or about February 11, 2019, McClain and ComEd Senior VP Hooker explicitly discussed how the payments and renewal of the JDA contract was demanded and required by Speaker Madigan. McClain stated, "We had to hire these guys because [Madigan] came to us. It's just that simple," and Hooker agreed, "It's, it's clean for all of us."

67.     On or about February 13, 2019, Doherty advised ComEd VP Marquez that Associate 1 and Associate 2 had been made "subcontractors" of JDA at Hooker's request.

Doherty further confirmed that Zalewski was also currently being paid as a "subcontractor," as Speaker Madigan had requested of ComEd, and ComEd then requested of Doherty.

68.     Doherty emphasized that the ComEd corrupt payment scheme was a safe secret and cautioned ComEd Senior VP Marquez that ComEd should not tamper with the arrangement because ComEd's "money comes from Springfield." Doherty confirmed he had "every reason to believe" that Speaker Madigan, through McClain and Hooker, knew about the ComEd payoffs.

69.     Doherty added that Speaker Madigan's associates took bribes quietly and actually did no work for JDA. Speaker Madigan's associates, Doherty said, "keep their mouth shut, and you know so. But do they do anything for me on a day to day basis? No."

70.     Doherty explained that ComEd paid people on JDA's payroll "to keep Speaker Madigan happy, I think it's worth it because you'd hear otherwise."

71.     On or about March 5, 2019, McClain and ComEd again discussed how to continue paying bribes to Speaker Madigan's associates, through JDA, for another year.

72.     During that March 5, 2019 meeting, McClain explained that for decades, ComEd had provided an "old-fashioned patronage system" to Speaker Madigan with ComEd jobs such as meter readers.

73.     In response, a ComEd employee acknowledged that it was buying legislative favors from Speaker Madigan. ComEd viewed such hires as a "chip" for ComEd to use in seeking favorable legislative treatment.

74.     On or about March 6, 2019, McClain and ComEd VP Hooker discussed renewal of the JDA's contract.

75.     During the March 6, 2019 conversation, ComEd through Hooker explained that by paying off associates of Speaker Madigan, ComEd had an advantage in obtaining favorable

16

legislation. He told McClain that when lobbying for ComEd "with the [Doherty] stuff, you got a little leg up," to which McClain agreed.

76.     Hooker later added, "I mean it's uh, unmentioned, but you know, that which is understood need not be mentioned.' McClain responded, "Right. Exactly. Exactly."

77.     Between around 2011 to 2019, ComEd paid bribes to Speaker Madigan's associates for doing no work that totaled at least $1,324,500. These indirect payments were made through JDA as well as through other third parties. The payments were intended to induce and reward Speaker Madigan for advancing and passing legislation favorable to ComEd and Exelon in the Illinois General Assembly including the 2011 EIMA, the 2013 EIMA amendments, and the 2016 FEJA.

78.     The corrupt ComEd payments through JDA were such a routine and established corrupt operation that ComEd would not discontinue any of these payments without seeking the approval of Speaker Madigan and McClain.

79.     The corrupt payments ComEd made to Speaker Madigan's associates through JDA and otherwise were concealed in ComEd's payment system to hide the bribes. The payments were funneled through third parties to conceal the fact that the payments were bribes.

### ComEd Board Appointment of Juan Ochoa

80.     Beginning in or around 2017, Speaker Madigan sought the appointment of one of his associates, Juan Ochoa,[14] to the ComEd Board of Directors. McClain communicated Speaker Madigan's request to then-ComEd CEO Anne Pramaggiore.

81.     In or around May 2018, Pramaggiore asked McClain if Speaker Madigan would

---

[14] Ochoa is referred to as "Board Member 1" in the Deferred Prosecution Agreement. Ochoa was the president of the Metropolitan Pier and Exposition Authority from 2007-2010, and a close political associate of Speaker Madigan.

be satisfied if she arranged for Ochoa to receive a part-time job that paid an equivalent amount of money to a board member position, namely, $78,000 a year.

82.     McClain declined the proposal and told Pramaggiore to "keep pressing" for the appointment of Ochoa. Pramaggiore agreed to do so even over internal opposition at ComEd.

83.     In or around September 2018, Pramaggiore (who by that time had been promoted to senior vice president and CEO of Exelon Utilities, in which capacity she maintained oversight over ComEd) assured McClain that Pramaggiore was continuing to advocate for the appointment of Ochoa. Pramaggiore explained that "You take good care of me, and so does our friend [Madigan] and I will do the best that I can to, to take care of you."

84.     As Speaker Madigan demanded, ComEd appointed Ochoa to the ComEd Board. On or about April 25, 2019, Pramaggiore advised McClain by text message, "Just sent out Board approval to appoint [Ochoa] to ComEd Board." The following day, April 26, 2019, ComEd filed a notice with the United States Securities and Exchange Commission stating that Ochoa had served as a director of ComEd since April 2019.

85.     No one at ComEd or Exelon recruited Ochoa to serve as a director. ComEd did not interview or vet other outside candidates for the vacant board seat it filled with Ochoa.  It would have been customary practice to do so.

86.     ComEd appointed Ochoa to influence and reward Speaker Madigan for advancing the interests of ComEd in connection with his official duties such as by ensuring the passage the 2011 EIMA, the 2013 EIMA amendments, and the 2016 FEJA.

**Retention of Reyes Kurson**

87.     In or around 2011, ComEd agreed to retain Reyes Kurson[15], the law firm founded

---

[15] Reyes Kurson is referred to as "Law Firm A" in the Deferred Prosecution Agreement.

and run by Victor Reyes,[16] and entered into a contract pursuant to which ComEd agreed to provide Reyes Kurson with a minimum of 850 hours of attorney work per year.

88.     This contract with Reyes Kurson was entered into with the intent to influence and reward Speaker Madigan in connection with his official duties such as by ensuring the passage of the 2011 EIMA, the 2013 EIMA amendments, and the 2016 FEJA.

89.     In 2016, Reyes Kurson's contract with ComEd was up for renewal.

90.     As part of renewal discussions, ComEd initially sought to reduce the amount of the payment to Reyes Kurson because there was not enough appropriate legal work for Reyes Kurson to fill 850 annual hours.

91.     Thereafter, an attorney associated with Reyes Kurson, who is referred to in the Deferred Prosecution Agreement as Lawyer A,[17] complained to McClain about ComEd's effort to reduce the amount of work provided to Reyes Kurson.

92.     On or about January 20, 2016, McClain contacted then-ComEd CEO Pramaggiore and wrote, "I am sure you know how valuable [Lawyer A] is to our Friend [Madigan]," and then went on to write, "I know the drill and so do you. If you do not get involve [sic] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend [Madigan]. Our Friend [Madigan] will call me and then I will call you. Is this a drill we must go through?" Pramaggiore replied, "Sorry. No one informed me. I am on this."

93.     Thereafter, Pramaggiore tasked a ComEd employee to ensure that Reyes Kurson's

---

[16] Victor Reyes is a longtime political operative who was the head of the Office of Intergovernmental Affairs under Chicago Mayor Richard M. Daley, and the founder and head of the Hispanic Democratic Organization ("HDO"), an old-fashioned political patronage army. Martin Sandoval got his start in politics as a loyal soldier in HDO. HDO was disbanded in 2008, in the wake of a federal corruption investigation and allegations that HDO members received government employment in exchange for working to support political candidates.

[17] On information and belief, Lawyer A is Victor Reyes.

contract was renewed. That same employee was a "project manager" assigned to obtain legislative approval of FEJA. The project manager had no oversight authority over ComEd's legal department and was not otherwise involved in deciding what legal professionals the legal department retained.

94. ComEd assigned the project manager to ensure Reyes Kurson's contract was renewed to influence and reward Speaker Madigan advancing the interests of ComEd, such as by ensuring the passage of the 2011 EIMA, the 2013 EIMA amendments, and the 2016 FEJA.

95. In or around June 2016, ComEd renewed Reyes Kurson's contract.

### ComEd Internship Program

96. Beginning no later than 2013, and continuing until in or around 2019, ComEd operated a paid internship program.

97. As part of the internship program, ComEd provided Speaker Madigan and McClain a target number of internships to give primarily to students who resided Speaker Madigan's Ward[18] in Chicago.

98. ComEd hired students from Speaker Madigan's Ward, upon recommendation of Speaker Madigan or his associates, with the intent to influence and reward Speaker Madigan for advancing ComEd's interests in connection with his official duties including by ensuring the passage of the EIMA and the FEJA.

99. Through these schemes and other corruption over many years, ComEd and Exelon, along with a range of entities, lobbyists, consultants, and others, developed an elaborate corrupt enterprise of providing bribes and corrupt payments to public officials or their associates

---

[18] Speaker Madigan has been the Democratic Ward Committeeman for Chicago's 13th Ward since 1969.

in exchange for favorable treatment by Speaker Madigan and others in the Illinois General Assembly.

**B.      ComEd's bribery of Illinois elected officials injured Plaintiffs and the Class.**

100.     The State of Illinois, by and through its elected legislature, regulates the rates that ComEd may charge its customers, as well as the rate of return ComEd may realize from their business operations, including the provision of electricity to its customers.

101.     ComEd and Exelon have admitted to bribing public officials in Illinois including payments to influence Speaker Madigan.

102.     Madigan, as Speaker of the House of Representatives of Illinois, has tremendous power over all legislation passing through the General Assembly.

103.     Speaker Madigan controls what legislation is called for a vote in the House of Representatives.

104.     Speaker Madigan is also the chair of the Illinois Democratic Party with tremendous influence over fellow lawmakers.

105.     The Illinois General Assembly has routinely considered bills and has passed legislation which has had a substantial impact on ComEd's and Exelon's operations and profitability.

106.     The Legislation ComEd obtained, including the EIMA in 2011, a 2013 bill amending the EIMA to ensuring favorable implementation for ComEd, and the FEJA in 2016, enabled ComEd to lock in rate increases and other charges for the delivery of electricity, and over the last ten years has flooded ComEd and Exelon with billions of dollars in additional revenue.

107.     ComEd and Exelon secured the passage of these extremely beneficial bills, two of

which passed over the veto of Governor Patrick Quinn, while ComEd and Exelon were bribing Illinois elected officials and extending other benefits to influence and reward Illinois elected officials in or around 2011 until in or around 2019.

108.     Specifically, in 2011, with Madigan's support and direction, the General Assembly passed the Energy Infrastructure and Modernization Act ("EIMA"), sometimes referred to as the "Smart Grid Act," overriding the objection and veto of then Governor Patrick Quinn under the urging and at the direction of Speaker Madigan.

109.     Under EIMA, electricity distribution rates were locked into an escalating schedule which has resulted in materially increased revenues for ComEd.  In the past decade, these changes and others discussed below have allowed ComEd to more than double its annual profits and increased ComEd's revenues by $600 million per year.

110.     Before the passage of EIMA, the ComEd rates were set by the Illinois Commerce Commission ("ICC") based on a variety of factors including a profit margin on the capital it invested in its utility operations. ComEd's revenues also depended on the number of customers ComEd actually served, and how much electricity those customers used.

111.     EIMA amended the Illinois Public Utilities Act to effectively remove rate-setting authority from the ICC and fundamentally change the way electric utility distribution rates are set. Under the EIMA, ComEd rates for electricity distribution are set through a formula that guarantees a profit margin on a vastly expanded range of "investments," without regard to the number of customer or amount of electricity those customers use. Under the EIMA, the more ratepayer money ComEd spends, the more it gets to keep as profit. Because of this, ComEd profits and revenues could go up even if electricity use goes down.

112.     Under the new regulatory scheme set by the EIMA and bought by ComEd and

Exelon's corruption, utility customers throughout the state have paid, and will continue to pay, billions of dollars more to ComEd than they would have otherwise.

113.    The EIMA first passed the Illinois House of Representatives on May 30, 2011 with 67 votes [S.B. 1652, as amended], less than a veto-proof majority.  Speaker Madigan voted yes.

114.    The EIMA first passed the Illinois Senate on August 26, 2011 with 31 votes, also less than a veto-proof majority.

115.    On September 12, 2011, Illinois Governor Patrick Quinn vetoed EIMA, stating, that it will "guarantee annual rate increases while eliminating accountability" and "strip[s] away vital oversight and allow[s] these utilities to benefit from unnecessary costs [and] higher corporate profits." The Attorney General of Illinois supported the veto of EIMA because she believed that the legislation was bad for consumers.  The Chairman of the ICC, Doug Scott, supported the veto of the EIMA as bad for consumers.  Numerous consumer advocacy organizations, including the American Association of Retired Persons ("AARP") and the Citizens Utility Board ("CUB"), supported the veto of EIMA for the same reason.

116.    Governor Quinn, the Attorney General, ICC Chairman Scott, consumer advocacy groups and others opposed the bill for good reason. Instead of holding ComEd responsible for setting fair rates under the relatively transparent existing rate setting process, the EIMA allowed ComEd to effectively cut the ICC, consumer groups, ratepayers and others out of the rate setting process, and effectively set their own rates and gouge customers.

117.    The EIMA also cut large ratepayers out of the ICC ratemaking process, depriving them of their opportunity to advocate for just and reasonable rates.  With the regulatory agency out of the way, there was and is little opportunity to reign in ComEd and Exelon's gouging of

Illinois ratepayers.

118. The EIMA also provided for wholesale conversion from analog meters to so-called "smart meters" and related "smart grid" features at a cost to ratepayers of many hundreds of millions of dollars per year, costs which get passed to ratepayers in distribution and meter fees. These meters provide little if any benefit to most customers, but they greatly benefit ComEd by enabling ComEd to reduce its workforce of meter readers, thus decreasing their operating expenses. Under EIMA, not only do ratepayers pay more to save ComEd money, but with the change to formula rates, ComEd increasingly captures that cost savings as profit rather than passing along savings to ratepayers as it was required to do under the prior system.

119. The gubernatorial veto of the EIMA would have cost ComEd billions of dollars in projected annual revenue and sure-fire path to continually increasing revenues and profits. ComEd and Exelon, refusing to see billions of dollars slip away so easily, turned up the illicit pressure to close the deal.

120. During the legislative veto session in October 2011, the General Assembly through and with direction and support of Speaker Madigan voted to override Governor Quinn's veto and pass the EIMA. In order to override the veto, Speaker Madigan and ComEd flipped the votes of ten members of the House Democratic caucus who had originally opposed the bill.

121. Had it not been for ComEd and Exelon's bribery of Speaker Madigan and other members of the General Assembly and their associates, the General Assembly would not have had the votes needed to override Governor Quinn's veto of the EIMA.

122. Following its success in buying passage of the EIMA, ComEd and Exelon deepened their corrupt enterprise and continued to pay public officials for favorable legislative treatment. And they got what they paid for.

24

123.     In 2013, ComEd and Exelon passed through the General Assembly another bill to amplify the effect of the EIMA. Under the original EIMA (passed in 2011), ComEd and Exelon demanded that ComEd be paid profits on its total capital spending for the year starting January 1 of that year, so that ComEd could start turning a profit in January on investments it would not make until the following December. ComEd and Exelon also insisted on guaranteed profit rates in excess of 6% per year for ComEd investment reconciliations. But the original EIMA did not provide those sweetheart provisions for the utilities and ComEd was left with a 3.4% interest rate on reconciliation and earning a rate of return on investments as it actually made them. *See Commonwealth Edison Co. v. Illinois Commerce Com'n*, 2014 IL App (1st) 122860.

124.     Not deterred, ComEd and Exelon simply went back to the General Assembly.  In 2013, they purchased an amendment to the EIMA that locked in the utility's ability to start running up profits on January 1 and guaranteed the higher ComEd profit margins sought by ComEd and Exelon.

125.     ComEd and Exelon got Public Act 98-0015 passed in March 2013, with the support of Speaker Madigan, to "fix" the EIMA formula rates and ensure the utilities profits. Again, Governor Quinn vetoed ComEd and Exelon's bill.   And again, Speaker Madigan got his colleagues to vote to override the veto to ensure ComEd and Exelon got paid.  ComEd and Exelon's bill thwarted efforts of the ICC to protect consumers from the provisions of the EIMA. With the 2013 bill, ComEd and Exelon ensured ComEd would get another hundred million dollars a year in revenue.  After Public Act 98-0015 was implemented, ComEd distribution charges jumped nearly 20% for the average ratepayer in a single year in 2014.

126.     Then in 2016, Speaker Madigan and the General Assembly again passed legislation bought by ComEd and Exelon.  The Future Energy Jobs Act ("FEJA") renewed the

EIMA statutory formula rate setting process.

127.    In addition to ensuring continued distribution rate increases, the FEJA provided a variety of other revenue streams and bailouts for the utilities at the expense of ratepayers.

128.    The FEJA provided a $2.3 billion earmarked subsidy for Exelon nuclear power plants located in Clinton and the Quad Cities. This earmark is funded on the backs of utility customers, who pay a new fee labeled "Zero Emissions Credit" or rider "ZEA" on a ComEd bill. This fee takes an additional $235 million from consumers every year. These credits were represented by ComEd and Exelon as a way to encourage more output of nuclear power as a means to decrease carbon emissions. In reality, they were little more than stuffing over $2B of cash into Exelon's pockets as a subsidy for the Clinton and Quad Cities nuclear plants.  The Illinois General Assembly guaranteed Exelon this $235 million annual windfall for ten years for a total of more than $2.3 billion.

129.    In addition, the FEJA charged consumers for various energy efficient programs, which let ComEd "have its cake and eat it too" in three ways. First, Prior to the FEJA, ComEd administered certain energy efficiency programs and simply passed on the costs to ratepayers. Under the FEJA, ComEd could, for the first time, charge ratepayers a ComEd profit margin markup on all energy efficiency programs.

130.    Second FEJA expanded the energy efficiency programs, which dramatically expanded the base of ComEd "investments" on which ComEd could now charge a profit. Since ComEd was permitted to make a profit on its "investments," ComEd profits increased.

131.    Third, the EIMA statutory rate formula ensured ComEd distribution rates continue to grow higher and higher, even as efficiency programs should (in theory) suppress demand by decreasing energy usage (which could have lowered ComEd revenues under the prior

rate setting model). Ratepayers essentially paid the utilities extra, with profits, to save electricity, and then let the utilities capture the financial benefits of energy efficiency on top of that.

132.     These new programs—although touted as helping consumers—actually funnel higher profits to ComEd.

133.     The EIMA, EIMA amendments, and the FEJA worked—and continue to work— to guarantee dramatically increased revenues and profits for ComEd and Exelon.  ComEd distribution rate revenues have grown by hundreds of millions of dollars since 2014. Under the statutory formula rates and with the FEJA fees, ComEd collects more than $600 million extra each year, and has collected over $3.3 billion more than it would have received without the bribery purchased legislation. ComEd and Exelon's corruption has paid off, and will continue to pay off, handsomely for both Defendants.

134.     ComEd's net operating income has likewise grown steadily every year since 2012. Of the $3.3 billion increase in revenues, over $850 million has simply gone to line the pockets of ComEd and Exelon.

135.     In addition, the fees created by the FEJA alone are expected to top $12 billion.

136.     To keep the favors and profits flowing from Springfield, ComEd and Exelon continued the enterprise of corrupt payments and benefits to Illinois elected officials to create, enhance, and protect the favorable rate structure started in the EIMA.  This ongoing pattern of corruption, as discussed above, continued until at least 2019.  And it continued to work well for ComEd and Exelon by returning ballooning profits.

137.     And now ComEd, Exelon, and others in the racketeering enterprise have been caught.

138.     On July 16, 2020, ComEd and Exelon entered into a Deferred Prosecution

Agreement with the United States Attorney in which they admit they were running a corrupt enterprise through a long-standing pattern of bribery of Speaker Madigan and other legislators to obtain the passage of legislation which resulted in "reasonably foreseeable anticipated benefits to [Defendant] ComEd of such legislation exceeded $150,000,000." Indeed, as stated above, the actual benefits received were many times greater than $150,000,000.

### C. The costs of the corrupt ComEd-Exelon enterprise fall disproportionately on large non-residential ratepayers across Illinois.

139.    Large commercial (non-residential) ratepayers have been and continue to be disproportionately injured by the illegal activities of the corrupt enterprise run by ComEd and Exelon. Though large commercial ratepayers are a small fraction of the overall utility customers—approximately half of 1% of ComEd's customers—they pay the majority of the increases in distribution charges exacted on ratepayers. As just one example, large commercial ratepayers paid over half of the increase in ComEd distribution revenues since 2011 and far more than smaller ratepayers.

140.    Under the legislation, large commercial ratepayers (those with peak demand over 100 kW, classified as the "Medium", "Large", "Very Large", and "Extra Large" class ratepayers) pay ComEd on average 25.5% more for distribution of electricity each year, totaling hundreds of millions of dollars.

141.    By contrast from 2011 to 2019, ComEd residential ratepayers experienced a far more modest increase in their annual bills of 7.7% on average, while small business ratepayers faced only a 5.7% increase on average.

142.    The legislations' statutory formulas permitted ComEd to design a rate structure that guaranteed these discrepancies.  Nothing else would have been politically feasible, even as greased by the ComEd and Exelon corruption. The EIMA, its amendments, and FEJA mandated

massive increases in payments to utilities. Those increases had to be paid by someone. The political fallout for forcing huge utility rate increases on the backs of homeowners and small businesses—local voters—would have been a career-ender for many of the members of the legislature. Yet the legislature did vote to provide a windfall to ComEd and Exelon. And sure enough, after the legislature voted to effectively cut the ICC out of the rate setting process, ComEd and Exelon designed new distribution rates under the EIMA statutory formula that foisted the majority of the increased costs on the very few largest ratepayers.

      **D.**     **The corrupt ComEd enterprise damaged the business and property of Plaintiffs and the Class.**

143.     Plaintiffs and the Class have paid and will continue to pay higher utility costs than they would and should have but for the corruption of Defendants. The Class was targeted by ComEd and Exelon, and it shoulders a disproportionate share of increased costs that stem from Defendants' corrupt legislation.

144.     Large commercial ratepayers experienced far higher increase in their annual utility costs from the Legislation than other ratepayers, and a dramatic rise in payments overall that fueled ComEd and Exelon's illegal profits.

145.     Table 1, for example, shows how much the legislation and ComEd increased the annual distribution charges for the average customer by rate class under the EIMA.

| Table 1: ComEd Distribution Charge Damages Trends by Ratepayer Category | | | | |
|---|---|---|---|---|
| | Peak Demand | Average 2011 Distribution Charge | Average 2019 Distribution Charge | Cumulative Change |
| **Residential** | | $379 | $408 | 7.7% |
| **Small Non-Residential** | (0 - 100 kW) | $1,162 | $1,228 | 5.7% |
| **Large Commercial Combined** | (>100kW) | $25,313 | $31,758 | 25.5% |
| Medium | (100 - 400 kW) | $9,748 | $12,479 | 28.0% |
| Large | (400kW – 1mW) | $34,449 | $40,705 | 18.2% |
| Very large | (1mW - 10mW) | $133,039 | $157,710 | 18.5% |
| Extra large | (>10 mW) | $568,112 | $1,013,570 | 78.4% |
| **Other** | | | | |
| High voltage | | $198,606 | $133,207 | -32.9% |
| Watt-Hour | | $342 | $271 | -20.8% |
| Railroad | | $283,113 | $344,032 | 21.5% |
| Lighting/other | | $2,472 | $3,066 | 24.0% |

## E. The RICO Enterprise

146. Defendants achieved their series of legislative victories through an association-in-fact enterprise, with a distinct leadership and hierarchy, that operated for the purpose of securing legislation that was favorable to Defendants through a pattern and continuous series of related corrupt acts stemming from at least 2010 through 2019 ("Enterprise").

147. The Enterprise also conspired to and did direct Defendants' pattern of racketeering activities, which included but were not limited to the specific acts of mail and wire fraud and bribery described herein.

148. The Enterprise was led by Defendants, and it included unnamed coconspirators that among other unlawful and corrupt acts agreed to direct and facilitate bribes and favors for Speaker Madigan's associates in exchange for Speaker Madigan ensuring the passage of legislation that was favorable to Defendants such as the 2011 EIMA, the 2013 EIMA amendments, and the 2016 FEJA. The individuals that participated and conspired as part of the

Enterprise include, but are not limited to:

a.  Speaker Madigan: Speaker Michael Madigan has been the Speaker of the
    Illinois House of Representatives for all but two years since 1983. A
    legendary political boss, he is the longest serving leader of any state or
    federal legislative body in the history of the United States. On information
    and belief, he was at all relevant times aware of ComEd and Exelon's
    efforts to bribe him in exchange for advancing favorable legislation that
    would increase its profits including the EIMA, the EIMA amendments,
    and FEJA. In fact, Speaker Madigan required bribes from ComEd and
    Exelon in the form of jobs, contracts, and monetary payments for his
    associates. On occasions described herein other members of the enterprise
    admitted that their instructions to arrange ComEd jobs and contracts for
    Madigan associates came from Speaker Madigan.

b.  Michael McClain: McClain is a former Illinois State Representative. He
    worked as an external lobbyist for ComEd—regularly coordinating efforts
    with Exelon lobbyists—during the time period giving rise to events
    described herein. McClain was a close associate of Speaker Madigan and,
    as described herein, he frequently communicated Speaker Madigan's
    instructions to ComEd with regard to hiring, rewarding, and paying
    Speaker Madigan's associates. McClain, along with Doherty and Hooker,
    devised a scheme whereby associates of Speaker Madigan would receive
    indirect payments from ComEd in exchange for Speaker Madigan
    advancing the interests of ComEd through his official duties.

c. Jay Doherty: As described herein, Doherty owned and operated JDA. Doherty, along with McClain and Hooker, created a scheme whereby associates of Speaker Madigan would receive indirect payments from ComEd in exchange for Speaker Madigan advancing the interests of ComEd through his official duties.

d. Anne Pramaggiore: As described herein, Pramaggiore was CEO of ComEd from 2012-2018 and then senior vice president and CEO of Exelon Utilities. She knew about and agreed to the arrangement whereby ComEd made indirect payments to associates of Speaker Madigan through JDA. She knew about specific associates of Speaker Madigan who were receiving such indirect payments. Pramaggiore effectuated the appointment of Speaker Madigan's associate, Juan Ochoa, to the ComEd Board of Directors, and the renewal of Reyes Kurson's contract with ComEd at the behest of Speaker Madigan. She did so in exchange for Speaker Madigan advancing the interests of ComEd through his official duties.

e. John Hooker: Hooker retired as Senior Vice President of Legislative and External Affairs at ComEd in 2012, and from 2012 to 2019, he worked as an external lobbyist for ComEd. Hooker, along with Doherty and McClain, created a scheme whereby associates of Speaker Madigan would receive indirect payments from ComEd in exchange for Speaker Madigan advancing the interests of ComEd through his official duties.

f. Fidel Marquez, Jr.: Marquez served as ComEd's Senior VP of legislative

and external affairs from March 2012 until September 2019. Marquez knew about the scheme whereby ComEd made indirect payments to associates of Speaker Madigan through the JDA, and he knew about specific associates of Speaker Madigan who were receiving such indirect payments. He was in agreement with the Enterprise to conceal the scheme.

**F.    The Deferred Prosecution Agreement**

149.    In July 2020, ComEd and Exelon stipulated to the truth of the facts stated in the Deferred Prosecution Agreement (**Exhibit 1**), which states that ComEd and Exelon corruptly gave, offered, and agreed to give things of value, namely jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts for the benefit of Illinois elected officials including Speaker Madigan, and their associates, with intent to influence and reward Illinois elected officials, as agents of the State of Illinois, a State government that during each of the twelve- month calendar years from 2011 to 2019, received federal benefits in excess of $10,000, in connection with any business, transaction, and series of transactions of $5,000 or more of the State of Illinois, namely, legislation affecting ComEd and its business, in violation of 18 U.S.C. § 666(a)(2).

150.    In so doing, ComEd and Exelon admitted, accepted, and acknowledged that it was responsible under United States law for the acts of its current and former officers, employees, and agents as charged in the Information and set forth in the Statement of Facts, which was attached as Exhibit A and incorporated by reference into the Deferred Prosecution Agreement.

151.    ComEd and Exelon admitted, accepted, and acknowledged that the facts alleged in the Information and described in the Statement of Facts of the Deferred Prosecution Agreement were true and accurate.

33

152. The facts admitted by Defendants in the Deferred Prosecution Agreement include that ComEd and Exelon bribed public officials.

153. ComEd and Exelon have agreed that it will neither contest the admissibility of nor contradict the Statement of Facts of the Deferred Prosecution Agreement in any legal proceeding, including any trial, guilty plea, or sentencing.

154. ComEd and Exelon expressly agreed that they shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for ComEd or Exelon, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by ComEd and Exelon set forth in the Deferred Prosecution Agreement or the facts within the Statement of Facts.

## CLASS ACTION ALLEGATIONS

155. Plaintiffs bring this action on their own behalf and on behalf of all other similarly situated individuals and businesses (together, the "Class") pursuant to Fed. R. Civ. P. 23, defined as:

> Large commercial utility customers of ComEd (those classified as peak load of 100kW or higher) from January 1, 2012 to the present.

156. The proposed Class includes in excess of 22,000 Class members. The Class is so numerous that joinder would be impracticable.

157. Questions of law and fact common to the Class include, but are not limited to, the following:

> g. Whether Defendants and The Enterprise engaged in public corruption and the exchange of bribes in connection with the enactment of the EIMA, the EIMA amendments, and the FEJA;

h.      Whether Defendants and The Enterprise engaged in mail and wire fraud in connection with the enactment of the EIMA, the EIMA amendments, and the FEJA;

i.      Whether Defendants and The Enterprise engaged in a pattern of racketeering that injured the Class's business and property interests;

j.      Whether Defendants and The Enterprise engaged in a conspiracy to commit racketeering acts that injured the Class's business and property interests;

k.      Whether Defendants engaged in an unfair business practice by bribing public officials to ensure the passage of the EIMA, the EIMA amendments, and the FEJA;

l.      Whether Defendants engaged in a fraudulent and/or deceptive scheme to deceive the public and ratepayers as to the true nature and purpose of the EIMA, the EIMA amendments, and the FEJA, and concealed the fact that the EIMA had been corruptly induced because of bribes and, not to promote improved electrical service in Illinois;

m.      Whether Defendants engaged in a pattern and practice of disseminating materially false information, misrepresentations, omissions, and concealment regarding Defendants' support of the EIMA, including the false claim that the EIMA would benefit the Class, instead of steadily increasing the Class's electricity costs;

n.      Whether Defendants were unjustly enriched at the expense of ComEd customers by the bribery scheme;

o.      Whether securing rate increases through a bribery scheme was an unfair practice;

p.      Whether Plaintiffs and the Class are entitled to treble damages under RICO;

q.      Whether Plaintiffs and the Class are entitled to punitive damages;

r.      Whether Plaintiffs and the Class are entitled to injunctive relief to stop these unlawful and corrupt practices.

158.    Plaintiffs' claims are typical of those of all members of the Proposed Class, and Plaintiffs will fairly and adequately represent the Class. Plaintiffs are customers in ComEd's largest rate classes who were affected in the same manner, and suffered losses similar in kind, to all other customers in their rate classes as result of the new regulatory scheme and increased distribution rates, tariffs, and fees that were cooked in to the corrupt legislation.

159.    Plaintiffs are represented by experienced counsel that have extensive experience handling all aspects of class action and complex litigation. Plaintiffs' counsel have the resources, expertise, and experience to the prosecute this action. Plaintiffs' counsel know of no conflicts among Class members or between the attorneys and Class members.

## CLAIMS ALLEGED

### COUNT I
### RICO  - Violation of 18 U.S.C. § 1962 (c)

160.    Plaintiffs adopt and incorporate all allegations of this Complaint.

161.    Section 1962 (c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of

such enterprise's affairs through a pattern of racketeering activity …"

162.     Defendants and their co-conspirators, as identified herein, are "persons" within the meaning of 18 U.S.C. § 1961 (3), who conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962 (c).

163.     The Enterprise was engaged in, and the activities of the Enterprise did affect, interstate commerce. Defendants are associated with The Enterprise.

164.     From its inception, the Enterprise had a clear decision-making hierarchy or structure, with Defendants directing the Enterprise.

165.     ComEd and Exelon paid its "Lobbyists," not as true employees, but rather as co-conspirators, intent on helping the Enterprise succeed in promoting the "money machine" ComEd and Exelon had created and concealed by misrepresentations and omissions, the corrupt source of ComEd and Exelon's success.

166.     All of the Enterprise's members are distinct from the Enterprise itself, and each member exercised control over distinct functions of the Enterprise.

167.     Defendant(s) agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs and the Class. For example, Defendants devised a scheme to direct payments, jobs, and contracts to associates of Speaker Madigan, for the express purpose of rewarding and influencing Speaker Madigan and to advance the interest of Defendants through his official duties such as the passage of the 2011 EIMA, the 2013 EIMA amendments, and the 2016 FEJA.

168.     Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of deprivation of honest services through bribes and kickbacks (18 U.S.C. §

1346), mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) between at least 2011 and 2019.

169.     The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961 (5).

170.     Defendants have directly and indirectly conducted and participated in the conduct of The Enterprise's affairs through the pattern of racketeering and activity descried above, in violation of 18 U.S.C. § 1962 (c).

171.     As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962 (c), Plaintiffs have been injured in their business and property in that they have paid ComEd more than they would have and lost property value because of the racketeering activity that resulted in legislation favorable to large utilities including the passage of 2011 EIMA, the 2013 EIMA amendments, and the renewal of the law's regulatory scheme in the 2016 FEJA.

## COUNT II
### RICO Conspiracy - Violation of 18 U.S.C. § 1962 (d)

172.     Plaintiffs adopt and incorporate all allegations of this Complaint.

173.     As set forth above, Defendants agreed and conspired to violated 18 U.S.C. § 1962 (c). Specifically, Defendants devised a scheme to direct payments, jobs, and subcontracts to associates of Speaker Madigan for the express purpose of rewarding and influencing Speaker Madigan to advance the interest of Defendants through his official duties such as the passage of the 2011 EIMA, the 2013 EIMA amendments, and the 2016 FEJA. They did so using mail, email, and the telephone.

174.     Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of The Enterprise through a pattern of racketeering activity. Defendants

knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described herein. The conduct constitutes conspiracy to violate 18 U.S.C. § 1962 (c), in violation of 18 U.S.C. § 1962 (d).

175.    As direct and proximate result of the Count IV Defendant(s)' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962 (d), Plaintiffs have been injured in their business and property.

## COUNT III
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 ILCS 505/1, et seq.

176.    Plaintiffs adopt and incorporate all allegations of this Complaint.

177.    The Illinois Consumer Fraud Act ("ICFA") is a regulatory and remedial statute intended to protect consumers, borrowers, and businesspersons against fraud, unfair methods of competition, and other unfair and deceptive business practices. 815 ILCS 505/1, *et seq*.

178.    ComEd is a "person" as defined by Section 505/1(c) of the ICFA.

179.    Exelon is a "person" as defined by Section 505/1(c) of the ICFA.

180.    Plaintiffs and each of the other Class members are "consumers," as defined by Section 505/1(e) of the ICFA.

181.    From 2011 through 2019, ComEd and Exelon engaged in unfair practices in the form of its admitted efforts to corruptly, criminally, and unlawfully influence and reward Illinois elected officials to assist ComEd and Exelon with the passage of legislation favorable to ComEd and Exelon.

182.    ComEd and Exelon's bribery of Illinois elected officials paved the way for the passage of laws that benefited Defendants, leading to higher utility costs under EIMA, the EIMA amendments, and FEJA.

183.     ComEd and Exelon's unfair practices occurred in its course of conduct involving trade and/or commerce.

184.     ComEd and Exelon's conduct in engaging in bribery and corruption of public officials to assist in passage of favorable legislation offends public policy, is immoral, unethical, oppressive, and unscrupulous.  These actions are "unfair practices" under the ICFA.

185.     As a direct and proximate result of ComEd and Exelon's unfair practices, Plaintiffs and the other Class members suffered harm and actual damages in an amount to be determined at trial.

186.     The harm caused to Plaintiffs and the other Class members outweighs any countervailing benefit produced by ComEd and Exelon's unlawful and unfair practices.

187.     Neither Plaintiffs, nor the other Class members could have reasonably avoided this harm, due to the nature of the Parties' relationship and ComEd and Exelon's concealment of its unfair practices.

## COUNT IV
## Civil Conspiracy

188.     Plaintiffs adopt and incorporate all allegations in this Complaint.

189.     Defendants conspired with The Enterprise and others to commit unlawful or tortious acts, including corrupt and illegal acts to influence Speaker Madigan and other Illinois elected officials through illegal bribes in the form of monetary payments, contracts, and jobs for Speaker Madigan's associates.

190.     They did so for the purposes of rewarding and influencing Speaker Madigan to advance the interests of Defendants through the exercise of his official duties by effectuating the passage of the EIMA, the EIMA amendments, and the FEJA.

191.     In furtherance of their conspiracy, Defendants did provide bribes in the form of

monetary payments, contracts, and jobs to a number of Speaker Madigan's associates in exchange for Speaker Madigan effectuating the passage of the EIMA, the EIMA amendments, and FEJA.

192. As a result, Plaintiffs and the Class were injured and suffered damages, as described above.

**COUNT V**
**Unjust Enrichment**

193. Plaintiffs adopt and incorporate all allegations in this Complaint as if fully set forth herein.

194. From 2011 to 2019, ComEd and Exelon unjustly retained benefits in an amount to be determined at trial.

195. ComEd and Exelon unjustly retained these benefits, to the detriment of Plaintiffs and the Class, by illegally bribing Illinois elected officials and their associates for the purpose of influencing them to gain their essential support for the passage of EIMA, the EIMA amendments, and FEJA.

196. As a result, ComEd and Exelon's retention of the benefits produced by EIMA, the EIMA amendments, and the FEJA, secured through ComEd's and Exelon's illegal conduct, violates the fundamental principles of justice, equity, and good conscience.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class pray that this Court:

A. Certify the proposed class to litigate the claims of this complaint for class-wide adjudication under Federal Rule of Civil Procedure 23(b)(3) and/or (c)(4);

B. Appoint Plaintiffs as representative of the Class;

C. Appoint Plaintiffs' Counsel as Class counsel pursuant to Rule 23 (g)(1);

41

D.      Declare that Defendants have violated RICO and the ICFA;

E.      Order injunctive relief that Defendants cease and desist in the unfair and unlawful practices including the bribery, fraud, and corruption of the RICO enterprise;

F.      Award Plaintiffs and the Class all available legal and equitable relief including compensatory damages, actual damages, nominal damages, interest, and penalties;

G.      Award Plaintiffs and the Class treble damages under RICO;

H.      Award Plaintiffs and the Class punitive damages;

I.      Order the disgorgement of all funds wrongfully held by Defendants that unjustly enrich Defendants;

J.      Order Defendants to pay Plaintiffs' and the Class's reasonable attorney's fees and expenses, including expert costs.

K.      Order all other appropriate relief as the interest of justice may require.

## JURY DEMAND

Plaintiffs requests a jury trial on all claims that can be tried by a jury.

August 24, 2020                                              Respectfully submitted,


                                                             _/s/ Matthew J. Piers_____
                                                             One of the Attorneys for Plaintiffs

Matthew J. Piers
Mark Dym
Chirag G. Badlani
Charles D. Wysong
Emily R. Brown
**Hughes Socol Piers Resnick & Dym, Ltd.**
70 W. Madison St., Suite 4000
Chicago, IL 60602
mpiers@hsplegal.com
mdym@hsplegal.com
cbadlani@hsplegal.com
cwysong@hsplegal.com
ebrown@hsplegal.com
(312) 580-0100